UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SII INVESTMENTS, INC.,

    Plaintiff/Counterclaim Defendant,

v.                                                        Case No.  8:05-cv-463-T-24 MSS

JEAN JENKS,

    Defendant/Counterclaim Plaintiff.
_____/

**ORDER**

    This cause comes before the Court on Plaintiff's Motion for Expedited Proceeding and Motion for Preliminary Injunction to Stay Proceedings in Arbitration.  (Doc. No. 3).  Defendant opposes this motion.  (Doc. No. 6, 7).

**I.  Background**

    SII Investments, Inc. ("SII") is a registered securities broker/dealer, and it is a member of the National Association of Securities Dealers, Inc. ("NASD").  This suit arises due to Jean Jenks, a former customer of SII, filing a Statement of Claim with the NASD Office of Dispute Resolution, thereby initiating an arbitration proceeding against SII.

    Jenks alleges the following in her Statement of Claim (Doc. No. 1, Ex. A): In September of 1999, Jenks opened an account with SII and Dean W. Urick, a registered representative of SII. In July of 2000, Urick recommended that Jenks invest in ESAT Corporation ("ESAT").  Urick told Jenks that this investment was very safe and that since it was a newly formed company, he would let her know when ESAT needed investors.  Jenks agreed to invest in ESAT when the investment became available.  Jenks believed that ESAT was an investment that had been

investigated by SII.

Thereafter, on May 15, 2001, SII asked Urick to leave the firm.  SII disclosed the following information on Urick's Form U-5: "Some of Mr. Urick's activities were inconsistent w/ the firm's overall business strategies.  He was the subject of three customer complaints ytd, although no conclusion of any violation or wrongdoing was reached.  It was mutually agreed that he would engage a new broker dealer."  Two of the complaints involved alleged misrepresentations by Urick in connection with annuity switches.

Urick left SII and joined Rosenthal Collins Securities, LLC ("Rosenthal Collins").  Urick told Jenks that his move to Rosenthal Collins was something that he had been planning for quite some time and that it was an upward move so that he could become an Office of Supervisory Jurisdiction Manager.  Jenks believed Urick's reasons for leaving SII, and she moved her account from SII to Rosenthal Collins in July of 2001.

Jenks expected SII to notify her of any problems with Urick.  However, SII did not inform Jenks that three customer complaints had been filed against Urick, that SII was not comfortable with Urick's business practices, and that SII had requested that Urick leave.  Had SII disclosed this information to her, she would have stopped doing business with Urick.  Not having this information, Jenks moved her account to Rosenthal Collins, because she believed that Urick was a trustworthy broker who left SII voluntarily and on good terms in order to obtain a position of greater responsibility.[1]  Furthermore, due to SII's non-disclosure, Jenks relied on Urick's July 2000 representations concerning ESAT and subsequently invested $310,000 in

---

[1]SII contends that it did not know that Urick had convinced Jenks to transfer her account to Rosenthal Collins, nor did it know that Urick had associated with Rosenthal Collins.  (Doc. No. 3, Ex. 1, 2).

ESAT after she moved her account to Rosenthal Collins.[2]

Jenks contends, however, that the ESAT investment was not registered with the SEC, nor was it registered with the State of Florida.  Furthermore, Jenks alleges that Urick misrepresented and failed to disclose numerous material facts to her regarding ESAT, its operations, and the risks involved in the investment.  Additionally, Jenks contends that she never received a prospectus or offering memorandum for ESAT and SII failed to review the risk of this investment with her.

As a result, Jenks asserts five counts in her Statement of Claim.  In Count I: Breach of Contract, Jenks alleges that SII breached its contractual relationship with her by failing to handle her account properly, failing to properly supervise Urick, failing to disclose to her all material facts regarding Urick's fitness to handle her money, violating certain NASD Rules of Fair Practice in its dealings with her, violating certain portions of the Florida Administrative Code regarding prohibited business practices, and violating its own internal rules and procedures in its dealings with her.  In Count II: Common Law Fraud, Jenks alleges that she relied on SII's misrepresentations and omissions when she made investments to her detriment, causing substantial losses.  In Count III: Constructive Fraud through Breach of Fiduciary Duty, Jenks alleges that there was a fiduciary relationship between her and SII and that SII breached its fiduciary duties to her.  In Count IV: Gross Negligence, Jenks alleges that the industry standard of care is set forth by the NASD, the SEC rules, Florida's Administrative Code, and SII's internal guidelines and that SII's violations of this standard of care constitute gross negligence.

---

[2]Jenks made the following investments in ESAT: $100,000 on November 11, 2001; $100,000 on April 9, 2002; and $110,000 on December 5, 2002.

In Count V: Violations of Federal Securities Laws, Jenks alleges that no registration statement was filed or in effect with the SEC regarding ESAT when it was offered to Jenks, that SII committed fraud in the offer of ESAT to Jenks, and that SII committed fraud in connection with the sale of ESAT to Jenks. With regards to all five counts, Jenks requests, among other things, actual and rescissionary damages.

In response, SII filed the instant action, in which it seeks declaratory relief regarding (1) who should make the determination of whether this case is arbitrable, and (2) whether this case is arbitrable. (Doc. No. 1). Jenks filed a counterclaim to compel arbitration. (Doc. No. 12).

## II.  Motion for Preliminary Injunction

In the instant motion, SII seeks a temporary injunction enjoining Jenks from proceeding with the arbitration of her claims against SII (and to require her to have her claims tried in court instead). In order for this Court to issue the injunction, SII must show "'that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [SII] outweighs whatever damage the proposed injunction may cause [Jenks]; and (4) if issued, the injunction would not be adverse to the public interest.'" Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004)(quoting Seigel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000)). The parties dispute whether SII has a substantial likelihood of success on the merits regarding its argument that it should not be compelled to arbitrate Jenks' claims.

"The Federal Arbitration Act, preliminarily, only applies if the parties agreed 'to arbitrate under a written agreement for arbitration.'" Multi-Financial Securities Corp. v. King, 386 F.3d 1364, 1367 (11th Cir. 2004)(quoting 9 U.S.C. §§ 2, 4). "'[A]rbitration is a matter of contract and

a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Id. (quoting AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648-49 (1986)). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT & T Techs., 475 U.S. at 649. In the instant case, neither party disputes that this Court should decide whether the parties agreed to arbitrate Jenks' claims.

In determining whether the parties agreed to arbitrate Jenks' claims, the Court must first determine whether there was a written agreement between SII and Jenks to arbitrate, and if so, the Court must then determine whether Jenks' claims fall within the scope of the arbitration agreement. The validity of Jenks' underlying claims is irrelevant to the determination of whether SII should be compelled to arbitrate her claims. See King, 386 F.3d at 1365 n.1. This is true even if the underlying claims appear to be frivolous. See AT & T Techs., 475 U.S. at 649-50.

Jenks contends that there are two written agreements to arbitrate: (1) the NASD Code constitutes a written agreement to arbitrate, and (2) she and SII entered into a direct written agreement to arbitrate, which is contained in her account application. Accordingly, the Court will analyze each agreement to see if Jenks' claims are within their scope. This Court notes that when there is an agreement to arbitrate, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" AT & T Techs., 475 U.S. at 650 (quoting Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).

### A. NASD Code

Even if there was no direct written agreement to arbitrate between SII and Jenks, the NASD Code serves as a sufficient written agreement to arbitrate. See King, 386 F.3d at 1367 (citation omitted); Mony Securities Corp. v. Bornstein, 390 F.3d 1340, 1342 (11th Cir. 2004)(citations omitted). To determine whether Jenks' claims against SII are within the scope of the NASD Code's agreement to arbitrate, the Court must interpret the NASD Code as it would a contract under Florida law, giving effect to the parties' intent expressed by the ordinary meaning of the language used. See King, 386 F.3d at 1367 (citations omitted). However, "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Id. (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)).

In order to find that Jenks' claims are within the scope of the NASD Code's agreement to arbitrate, Jenks must show: (1) that her claims involve a dispute between a member and a customer or between an associated person of the member and a customer; and (2) that her claims arise in connection with the business activities of the member or in connection with the activities of the associated person. See King, 386 F.3d at 1367. SII does not dispute that it was a member at all relevant times. Instead, SII disputes Jenks' status as its customer and that her claim arises in connection with its business, since Jenks purchased the ESAT stock after she transferred her account to Rosenthal Collins. Accordingly, the Court will analyze each argument.

### 1. Customer Status

In order to compel SII to arbitrate Jenks' claims, Jenks must show that she was SII's customer. "The NASD generally defines the term 'customer' as anyone who is not a broker or a dealer." See King, 386 F.3d at 1367 (citing NASD Rule 0120(g)). Furthermore, customer status

"must be determined as of the time of the events providing the basis for the allegations" of Jenks' claims. Wheat, First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993). SII argues that according to Wheat, First, Jenks is not considered a customer of SII as of the time of the events providing the basis for the allegations of her claims.

In Wheat, First, investors instituted arbitration proceedings against Wheat First, Marshall Securities, and Kentwood Thackston (formerly an agent of Marshall Securities). See id. at 815. The investors alleged that Thackston, as an agent for Marshall Securities, made misrepresentations to them in connection with their purchase of certain stock. See id. at 816. Wheat First was not involved in any of the investors' purchases of the stock at issue. See id.

After the allegedly fraudulent stock transactions occurred, Wheat First purchased Marshall Securities' assets; however, Wheat First did not assume any of Marshall Securities' liabilities, except as set forth in their agreement (the investors' customer agreements were not included among the liabilities assumed). See id. The investors argued that Wheat First was liable for the acts of Marshall Securities as its successor in interest, and as such, it could be compelled to arbitrate their claims. See id.

The court stated that two prerequisites must be met before an NASD member can be compelled to arbitrate: (1) "a complaining party must be a "customer" of the NASD member," and (2) the claim "'must have arisen' in connection with the business of such member.'" Id. at 820. In analyzing whether the investors were customers of Wheat First such that they could compel Wheat First to arbitrate their claims, the court stated that customer status "must be determined as of the time of the events providing the basis for the allegations of fraud." Id. at 820. The Court rejected the argument that customer status should be determined at the time that

the arbitration complaint is filed, because it "would do significant injustice to the reasonable expectations of NASD members." Id.  The court stated that it could not "imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer." Id.  Since the investors were not customers of Wheat First at the time that the allegedly fraudulent stock transactions occurred, the court found that they could not compel Wheat First to arbitrate their claims.  See id.

In the instant case, SII argues that based on Wheat, First, Jenks was not its customer at the time of the events providing the basis for the allegations of her claims.   SII argues that if customer status were determined when an investment was mentioned to an investor, it could cause NASD member firms to be forced to arbitrate claims related to purchases made years after a client terminated their relationship with the member firm.  SII argues that such a situation would do significant injustice to SII's reasonable expectations regarding arbitration.

The Court rejects SII's reliance on Wheat, First.  To begin with, Wheat, First is distinguishable from the instant case.  In Wheat, First, Wheat First had no relationship with the investors at the time of their purchases of the stock at issue, since the investors became Wheat First's customers *after* they purchased the stock.  In the instant case, SII had a relationship with Jenks prior to her purchases of ESAT stock, and her claims are based on the actions taken by SII and Urick while she had an account with SII.[3]  Specifically, her claims are based on Urick's

---

[3]Likewise, Lehman Brothers Inc. v. Certified Reporting Company, 939 F. Supp. 1333, 1340 (N.D. Ill. 1996), took a similar approach in focusing on the relationship between the brokerage firm and the investor when analyzing customer status.  In Lehman Brothers, investors claimed that they bought certain stock in reliance on misrepresentations made by Lehman Brothers' employees.  See id. at 1336.  However, these investors did not purchase all of the stock

8

recommendation of the ESAT investment while he was associated with SII, SII's failure to disclose that it terminated Urick and the reasons for the termination, SII's alleged failure to supervise Urick while he was associated with SII, and SII's alleged failure to investigate the investment of ESAT prior to Urick recommending it to her. As such, Jenks' customer status is based on the fact that the allegations supporting her claims (i.e., what SII and Urick did and/or did not do) occurred while Jenks had an account with SII and undeniably was its customer.

SII focuses on the damages that Jenks' is seeking and argues that Jenks' claims relate to the sale of ESAT, which occurred after she moved her account to Rosenthal Collins. As such, SII argues that Jenks was not its customer at the time of the events providing the basis for the allegations of her claims (i.e., when the actual sales of ESAT occurred). The Court, however, rejects this argument. SII fails to cite any authority for its argument that the Court should focus on Jenks' request for damages (and therefore focus on the purchases of ESAT), rather than the allegations regarding what SII and Urick did and/or did not do, when determining the point in time that Jenks' customer status should be determined. Furthermore, the Court finds Jenks' argument more persuasive–that her purchases of ESAT grew out of and were a natural consequence of Urick's recommendation, made while he was associated with SII, that she purchase ESAT stock. As such, the Court finds that Jenks' customer status should be determined at the time when Urick recommended the purchase of ESAT stock (while he was associated with

---

from Lehman Brothers' brokerage office. See id. As a result, Lehman Brothers challenged the investors' contention that Lehman Brothers was required to arbitrate their claims relating to the stock that was purchased from other brokerage firms. See id. In determining whether the investors were customers with regards to their claims relating to the stock they purchased from other brokerage firms, the court found that the investors were customers because they "had some kind of relationship with Lehman at the time its employees were providing them with false and misleading information." Id. at 1340.

SII) and SII took and/or failed to take certain actions (while Jenks had an account with SII). Accordingly, the Court finds that Jenks was SII's customer at the time of the events providing the basis for the allegations of her claims.[4]

### 2. Connection to SII's Business

In order to compel SII to arbitrate Jenks' claims, Jenks must also show that her claims arise in connection with SII's business activities. The "in connection with" element focuses on particular types of disputes that are within the scope of the NASD Code's arbitration provision. See King, 386 F.3d at 1370. In other words, "in the universe of member-customer disputes, only a portion will arise in connection with the member's business and only those satisfy the Code's arbitration provisions." Id.

SII argues that Jenks' claims are aimed directly at the purchases of ESAT, which occurred after Jenks transferred her account to Rosenthal Collins. As such, SII argues that Jenks' claims do not arise in connection with SII's business activities. The Court rejects this argument. As stated above, Jenks' claims are based on Urick's recommendation of the ESAT investment while he was associated with SII, SII's failure to disclose that it terminated Urick and the reasons for the termination, SII's alleged failure to supervise Urick while he was associated with SII, and SII's alleged failure to investigate the investment of ESAT prior to Urick recommending it to her. Furthermore, Jenks alleges that she purchased ESAT as a result of

---

[4]Furthermore, this Court notes that in King, the Eleventh Circuit stated that a customer is defined by the NASD Code as anyone who is not a broker or a dealer. King, 386 F.3d at 1368. As a result, the court in King found that the investor was "a customer as long as she [was] not a broker or a dealer; nothing in the Code directs or otherwise requires more." Id. In the instant case, Jenks was not a broker or a dealer, and as such, according to King, Jenks is entitled to customer status.

Urick's recommendation, made while he was associated with SII, and as such, there is a connection between SII and the purchase of the ESAT stock. Accordingly, the Court finds that Jenks' claims arise in connection with SII's business activities. See, e.g., Bornstein, 390 F.3d at 1344-45 (stating that "supervision of associated persons arises in connection with the member's business").

### 3.  Conclusion

Based on the above, the Court finds that Jenks' claims involve a dispute between a member and a customer and that her claims arise in connection with SII's business activities. Accordingly, Jenks' claims are within the scope of the arbitration provision of the NASD Code, and as such, SII can be compelled to arbitrate Jenks' claims.

### B.  Agreement to Arbitrate Contained in SII's Account Application

Jenks also argues that her claims against SII are within the scope of the arbitration agreement contained in her account application. To determine whether Jenks' claims against SII are within the scope of the arbitration agreement contained in her account application, the Court must interpret the arbitration agreement as it would a contract under Florida law, giving effect to the parties' intent expressed by the ordinary meaning of the language used. See King, 386 F.3d at 1367 (citations omitted). However, as stated previously, "'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Id. (quoting Moses H. Cone, 460 U.S. at 24-25).

The arbitration agreement contained in Jenks' account applications provides the following: "IT IS AGREED THAT ANY CONTROVERSY BETWEEN US ARISING OUT OF

YOUR BUSINESS OR THIS AGREEMENT SHALL BE SUBMITTED TO ARBITRATION." (Doc. No. 7, Ex. 1). Jenks argues that her claims arise out of "her business," and as such, they fall within the scope of this arbitration agreement.

The phrase "your business" (referring to Jenks' business) is not defined within the arbitration agreement. Jenks argues that her claims that she lost money as a result of her investment in ESAT is a controversy arising out of her business. Specifically, Jenks argues that disputes about her investments involve disputes about her business, and as such, her claims are within the scope of this arbitration agreement. This Court notes that when there is an agreement to arbitrate, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" AT & T Techs., 475 U.S. at 650 (quoting Steelworkers, 363 U.S. at 582-83).

This Court, however, need not decide the merits of Jenks' broad interpretation. Instead, even if the Court were to construe the arbitration provision more narrowly and interpret it to include claims arising due to Jenks' *business relationship* with SII, Jenks' claims are clearly within the scope of this arbitration agreement. As stated previously, Jenks' claims are based on acts (or failures to act) that occurred while she had an account with SII. As such, her claims arise out of her business relationship with SII, and therefore, they are within the scope of the arbitration agreement contained in her account application. Accordingly, SII can be compelled to arbitrate Jenks' claims.

### III. Conclusion

Based on the above, it is ORDERED AND ADJUDGED that:

(1)  Plaintiff's Motion for Expedited Proceeding (Doc. No. 3-1) is **GRANTED**;

(2)  Plaintiff's Motion for Preliminary Injunction to Stay Proceedings in Arbitration (Doc. No. 3-2) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 26th day of May, 2005.

Susan C. Bucklew
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record